## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ERICA ANDERSON**,

      Plaintiff,

v.                                    Case No. 8:23-cv-2782-WFJ-AAS

**ANNE HUFFMAN** and
**CITY OF HAINES CITY, FLORIDA**,

      Defendants.

_____/

## ORDER

Before the Court in this employment action are Defendants' motions for summary judgment: Haines City, Florida's motion at Dkt. 34 and Anne Huffman's motion at Dkt. 36. The parties have filed their respective responses in opposition and replies (Dkts. 46, 48, 49, 50). Upon careful consideration of the filings, both motions are denied. The case will proceed to trial on the May 2025 docket.

## BACKGROUND

Plaintiff Erica Anderson worked as Haines City's Clerk from November 2020 until her termination in October 2022. Dkt. 35 ¶¶ 19, 20, 74, 88. Prior to her promotion to City Clerk, Ms. Anderson worked for the City as Deputy Clerk beginning in January 2017. *Id.* ¶¶ 19, 20. In May 2017, Defendant Huffman was elected to serve as one of five Haines City Commissioners. Dkt. 37 ¶¶ 2, 6. The City

1

Commissioners exercise the legislative power of Haines City, and elect amongst themselves one commissioner to act as mayor. *Id.* ¶¶ 2, 3. Ms. Huffman was mayor from May 2022 to May 2023. *Id.* ¶ 6.

The Commission collectively appoints and supervises the City Clerk, who is the administrative head of the City Clerk's office. Dkt. 35 ¶¶ 8, 14. The Clerk keeps all records pertaining to the City's affairs, attends all the Commission's meetings, maintains a journal of the City's proceedings, and can certify, under the seal of the City, true copies of all minutes, journal entries, and records. *Id.* ¶ 15. The City Clerk drafts the minutes for the Commission's meetings, and ensures the minutes are presented for the Commission's approval. *Id.* ¶¶ 16, 17. The Clerk likewise files and records Commission-approved ordinances and resolutions with Municode. *Id.* ¶ 18.

Haines City claims that Plaintiff's underperformance of theses duties resulted in her termination. *See, e.g.*, Dkt. 34 at 22. Plaintiff claims the City retaliated against her for a grievance she filed with the City against Defendant Huffman, her absence pursuant to the Family and Medical Leave Act, and an EEOC charge she submitted. *See, e.g.*, Dkt. 48 at 4, 11.

*Performance Evaluations*

In support of their positions, the parties first present Plaintiff's performance evaluations from the winter of 2021–2022. Each Commissioner completed one performance evaluation. Dkt. 35 ¶ 28. The parties naturally highlight different

responses in the evaluations, although they are available at Dkt. 33-1 pages 22–46 for independent review. The City cites two performance evaluations in particular. Dkt. 35 ¶¶ 29, 30. Commissioner Roy Tyler advised that "timely submissions of records and attendance at advisory committee meet[ing]s does not appear to be consistently maintained," and that city records were "not presented in a timely manner." Dkt. 33-1 at 42. Defendant Huffman's performance evaluation likewise suggested "[m]ore consistency in providing minutes in a more timely fashion." *Id.* at 37.

Plaintiff highlights the generally positive feedback in the Commissioners' performance evaluations. The rating scale spanned 1 (unacceptable) to 5 (outstanding), with Commissioner Jayne Hall penciling in "6," her own category of "Above & Beyond." *Id.* at 32. Defendant Huffman rated Plaintiff either a 4 or 5 in every category, commenting that "[o]verall Erica has exceeded my expectations. Her work ethics are exceptional. . . . She is reliable and dependable and a great asset to the city." *Id.* at 41. The Commissioner who awarded Plaintiff a "6" did so in the "City Records" and "Cemetery" management categories, and rated Plaintiff's work a "5" in every remaining category. *Id.* at 32–36. Two other Commissioners generally awarded Plaintiff 4s and 5s, with one 3 interspersed, and commented that Plaintiff "is an exceptional employee" who has done a "good" and/or "outstanding" job and who should "[k]eep up the good work." *Id.* at 22–31.

*Backlog of Minutes*

There is a dispute, or at least confusion, surrounding the issue of a "backlog of minutes." Haines City tenders a "backlog of minutes" as one legitimate business reason for firing Plaintiff. *See, e.g.*, Dkt. 34 at 23. The "backlog of minutes" seemingly refers to draft minutes of Commission meetings needing to be transcribed and officially approved by the Commission. Dkts. 35 ¶¶ 33, 34; 33-7 at p.21 trans. 78:1–79:25. It is Defendants' version of events that the backlog of minutes did not begin until after Plaintiff became the City Clerk. Dkt. 35 ¶ 35. Defendants contend that Plaintiff learned in February or March of 2022 that the Commission had concerns about these "missing" minutes. *Id.* ¶ 32. In February 2022, Plaintiff had hired someone to assist with the backlog. *Id.* ¶ 36. In either May or June of 2022, the minutes were still behind, so the Commission hired an outside agency to help resolve the backlog. Dkts. 35 ¶ 37; 47 ¶ 37. Defendants cite Plaintiff's deposition testimony as the source of this factual background.

Plaintiff asserts that minutes were behind from years before she assumed the position of Clerk and that the Commission knew this. Dkt. 47 ¶¶ 7, 8, 10. The depositions of Commissioner Jayne Hall, Defendant Huffman, and attorney David Carmichael (hired by Haines City to investigate Plaintiff's grievance, discussed *infra*) are cited to support these contentions. Dkts. 33-10 at p.8 trans. 29:3–30:22; 33-11 at p.33 trans. 132:6–8; 33-9 at p.24 trans. 94:1–95:1. Commissioner Hall

4

opined that the backlogged minutes had to have begun with the previous Clerk, perhaps ten years or more before Plaintiff's tenure, due to the volume of unrecorded minutes. Dkt. 33-10 at p.8 trans. 29:3–30:22. Investigative attorney Mr. Carmichael testified that the issue of missing minutes started before Plaintiff became Clerk and had been the subject of many Commission meetings. Dkt. 33-9 at p.24 trans. 94:1–95:1.

In anticipation of her performance reviews, *supra*, Plaintiff had also sent a letter to the Commission explaining challenges she faced with backlogged minutes due to COVID-related staff shortages and missed training opportunities. Dkt. 47 ¶ 11.

Somewhat conversely, Deputy Clerk Erica Sanchez stated in her deposition testimony that many of the minutes were not actually missing and there was just an IT issue with finalizing them, but the Commission maintained that Plaintiff was behind by an inflated number of minutes. Dkts. 47 ¶ 12; 33-12 at p. 16 trans. 61:1–64:22.

Notably, it is not always clear from the testimony if the "missing minutes" being discussed were missing minutes that were the Clerk's responsibility or missing minutes that were the Deputy Clerk's responsibility. There appears to be a distinction between the two, with the Deputy Clerk tending to minutes of advisory boards and meetings other than those of the City Commission. Dkt. 33-7 at p.21–22

trans. 80:17–82:6. There also appears to be a possible distinction in whether the Clerk's or Deputy Clerk's minutes were behind. *Compare* Dkt. 33-7 (Plaintiff's deposition) at p.21 trans. 80:21–23 ("[W]hen I was hired in 2017, I came on to the city [as Deputy Clerk], there was a backlog of minutes for five years that were behind."), *with id.* at p.21–22 trans. 81:25–82:3 (responding to whether there was a backlog of minutes for Commission meetings when Plaintiff came on as Clerk: "No. There was no backlog. The backlog did not start until after I started."). Defendant Huffman articulated her position that, since coming on as Deputy Clerk in 2017 then Clerk in 2020, Plaintiff was either directly or indirectly responsible for the missing minutes. Dkt. 33-11 at p.33 trans. 132:6–25. Commissioner Hall felt it unfair to pin the entirety of the backlogged minutes on Plaintiff. Dkt. 33-10 at p.8 trans. 29:3–30:22.

*April 18, 2022, Supervisor of Elections Letter*

In April 2022, the Polk County Supervisor of Elections presented a letter to the Haines City Manager entitled "Erica Anderson's disappointing pattern of unresponsiveness and missed deadlines." Dkt. 35 ¶ 38 (citing the letter at Dkt. 33-1 at 9). It explained Plaintiff's performance deficiencies during the April 5, 2022, municipal election, providing twelve paragraphs detailing same. Dkt. 33-1 at 9.

Plaintiff contends that the majority of the allegations in the letter were untrue. Dkt. 47 ¶ 29. She testified to meeting with Commissioners, except Commissioner

Huffman who "refused," and going through the letter "line by line" with evidence to refute the allegations therein. Dkts. 47 ¶ 30; 33-7 at p.37 trans. 143:22–145:12. Also working with Plaintiff during this time, Deputy Clerk Erica Sanchez felt that "[n]inety-nine percent of [the Supervisor of Elections'] letter was wrong." Dkt. 33-12 at p.12 trans. 45:7–18.

### May 31, 2022, Grievance by Plaintiff

On May 31, 2022, Plaintiff provided a letter to the City Attorney and City Human Resources Director entitled "Grievance." Dkt. 35 ¶ 39 (citing the letter at Dkt. 33-2 at 29–30). Ms. Anderson began by designating the letter as her "official filing of grievance concerning Mayor-Commissioner Anne Huffman," and requested that her complaints be investigated. Dkt. 33-2 at 29. The letter offered allegations supporting claims of "Hostile Work Environment," "Bullying," "Defamation," and "Psychological Harassment." *Id.*

The parties dispute with whom and when the City Attorney shared this grievance, which is relevant because of events that transpired at a Commission meeting days later. Defendants represent that the City Attorney first reviewed the grievance in-person with Commissioner Hall, who was Vice-Mayor at the time and therefore the one notified of complaints against the Mayor. Dkt. 35 ¶ 40. Defendants state that Commissioner Hall did not discuss the grievance with Commissioner Huffman, and that Commissioner Huffman did not learn of the grievance until

months later. *Id.* ¶¶ 40, 43. Commissioner Hall's cited deposition testimony, however, reflects that she was unsure if the City Attorney showed other Commissioners the grievance shortly after its filing. Dkt. 33-10 at p.9 trans. 34:18–23.

Plaintiff contends that every Commissioner, including Defendant Huffman, became aware of her grievance within a day or two of its submission. Dkts. 47 ¶ 37. City Commissioner Omar Arroyo testified that the City Attorney called each Commissioner within 24-48 hours after receiving the complaint to "explain what [it] meant." Dkt. 43-6 at p. 12 trans. 45:13–48:8. Investigative attorney Mr. Carmichael testified that Defendant Huffman not only became aware of the grievance almost immediately, but actually received a copy of it that she discussed and released to others. Dkt. 33-9 at p. 16 trans 62:5–22.

This grievance by Plaintiff is what the City hired Attorney Carmichael to investigate. Dkts. 35 ¶ 41; 47 ¶ 39. The parties also dispute when and how Mr. Carmichael shared the results of his investigation, which is relevant to the timing of the Commission's decision to suspend Plaintiff's employment. Defendants contend that Mr. Carmichael prepared a written report of his investigation and emailed it to the City Attorney on or about November 14, 2022. Dkt. 35 ¶ 42. He did not give a verbal report of his investigation to anyone at the City. *Id.* Plaintiff asserts that Mr. Carmichael had a telephone conference with the City Attorney and others on

8

September 21, 2022, the day before Plaintiff was suspended, to share a summary of his investigation. Dkt. 47 ¶ 71 (citing invoice for professional services at Dkt. 43-7).

Plaintiff contends that on May 31, but before the Commission was aware of this grievance, the Commission discussed giving her a raise. Dkt. 47 ¶ 42. But, after Plaintiff's grievance, Haines City's Human Resources Director testified that "it was just like a concerted effort going after her." Dkt. 44-1 at p.8 trans. 27:2–5.

*June 2, 2022, Incident at the City Commission Meeting*

On June 2, 2022, days after Plaintiff submitted her grievance, the Commission held a public meeting presided over by Defendant Huffman. Dkt. 35 ¶ 45. An individual named Barry Gaston, who was either Plaintiff's boyfriend or fiancé at the time, attended. Dkts. 35 ¶ 46; 43-3 ¶ 29. At a prior Commission public meeting, Mr. Gaston handed out flyers to attendees stating that Ms. Huffman was a convicted felon. Dkts. 35 ¶ 47; 33-11 at p.29 trans. 113:3–114:22. At the June 2 meeting, Mr. Gaston resumed that dialogue, questioning her ability to hold office. Dkt. 35 ¶ 48. Ms. Huffman invited Mr. Gaston to ask about something relevant, but Mr. Gaston continued, so Ms. Huffman asked him to leave. *Id.* Ms. Huffman then stated "as a point of clarification": "And just for those of you who are not aware, that's our City Clerk, Erica Anderson's other boyfriend." Dkts. 35 ¶ 49; 33-11 at p.29 trans. 114:14–16; 33-4 at 5.

Ms. Huffman contends that she actually believed another person was also Plaintiff's "boyfriend" based on conversations she had with Plaintiff. Dkts. 37 ¶ 26; 33-11 at p.27–28 trans. 106:19–112:23. Plaintiff counters that she did not have multiple boyfriends and never spoke to Ms. Huffman about her personal life or relationships. Dkt. 43-3 ¶¶ 28–30.

This comment now constitutes the sole basis of Plaintiff's sole remaining claim against Defendant Huffman: defamation *per se*. Dkt. 46 at 1–2. Plaintiff contends:

> The facts show that in order to retaliate against and injure Plaintiff because she was angry that Plaintiff had filed a whistle-blower complaint against her two days earlier, Huffman intentionally and publicly defamed Plaintiff on June 2, 2022 when she implied she was promiscuous during a public city commission meeting by implying she had multiple boyfriends.

*Id.* at 2.

### *Plaintiff's FMLA Leave*

Plaintiff contends that she ultimately took leave pursuant to the Family and Medical Leave Act due to the public humiliation at the June 2 Commission meeting. Dkts. 47 ¶ 47; 43-3 ¶ 34. Plaintiff officially started FMLA leave on June 27, 2022. Dkt. 35 ¶ 50. Before that, she "couldn't stop crying every time [she] was in the office." Dkt. 43-3 ¶ 32. She began seeing a therapist on June 5. *Id.* ¶ 33. The City's Human Resources Director advised Ms. Anderson that she could take FMLA leave to address her health because it was clear she was distraught and emotionally

distressed. Dkt. 43-5 at 113 ¶ 20. By July 13, Plaintiff was diagnosed with depression, insomnia, and anxiety. Dkt. 43-3 ¶ 33. She returned to work on September 22, 2022. Dkt. 35 ¶ 50.

Mr. Carmichael testified that Defendant Huffman made statements to the news in July about Plaintiff being "AWOL" despite knowing she was on FMLA leave. Dkt. 33-9 at p.15 trans. 58:22–59:1. The City's Human Resources Director also testified that Defendant Huffman asked whether the City could terminate Plaintiff while she was on FMLA leave. Dkt. 44-1 at p.10 trans. 35:22–25. The HR Director also attested to attending a meeting in early July in which she felt the City Attorney and other managerial employees of the City brainstormed "bogus" reasons to terminate Plaintiff's employment, such as salary-related reasons and reasons relating to the timeliness of her FMLA paperwork. Dkt. 43-5 at 113–14 ¶ 23.

### Municode While Plaintiff was on FMLA Leave

An issue of ordinances not being up to date in Municode arose while Plaintiff was on FMLA leave. Generally, when uploading ordinances and resolutions to Municode, Plaintiff testified that she, as Clerk, would certify that the document is true and correct. Dkts. 35 ¶ 53; 33-7 at p.23 trans. 87:4–12. The Clerk also had to verify and retain records of newspaper advertisements that notified the public of pending ordinances, which provided citizens the requisite chance to comment. Dkt. 33-7 at p.22–23 trans. 84:25–87:22. The Clerk did not have to certify that the

document had been duly noticed; the Clerk was just to retain records of the newspaper advertisements. *Id.* at p.23 trans. 87:13–22. It was Plaintiff's plan to complete these tasks and codify ordinances and resolutions with Municode in July 2022, but she went on FMLA leave before doing so. Dkt. 35 ¶ 54.

Defendants contend that, prior to going on leave, Plaintiff had not advised Deputy Clerk Erica Sanchez about Municode or how to update it. Deputy Clerk Sanchez acted as Interim Clerk while Plaintiff was on leave, but testified that she did not understand the Municode process at that time, and that Municode first came to her attention in July 2022 when the City received an invoice. Dkts. 35 ¶¶ 55, 56; 33-12 at p.7 trans. 26:15–27:18. Upon receiving that invoice, Ms. Sanchez called Plaintiff, who then briefly explained enough about Municode to allow Ms. Sanchez to conduct independent research on the process. Dkts. 35 ¶ 56; 33-12 at p.7 trans. 27:9–25.

Plaintiff insists that she advised and trained Ms. Sanchez regarding Municode prior to taking her leave. Dkts. 33-7 at p.22 trans. 85:7–13; 43-3 ¶ 38. She explained that they were going to codify with Municode in July, and prior to doing so they must ensure that the ordinances were noticed in the newspaper. Dkts. 33-7 at p.22 trans. 85:7–13; 43-3 ¶ 38.

Defendants point out that while Plaintiff was Clerk, she was aware of ordinances and resolutions from 2020 that had not been uploaded to Municode. Dkt.

35 ¶ 57. Indeed, the last ordinances were updated in Municode in July 2020 when the former Clerk uploaded them. *Id.* ¶ 58. Plaintiff clarifies, however, that there is no specific time by which a city must codify ordinances, and that all of the ordinances were up to date, just not codified. Dkt. 47 ¶¶ 57, 60. Members of the public could obtain the most updated version of an ordinance by calling and asking for a copy. *Id.* ¶ 61.

### *Plaintiff's Suspension*

Plaintiff returned from FMLA leave on September 22, 2022. Dkt. 35 ¶ 50. That day, at 7:00 p.m., the Commission conducted a public meeting that Plaintiff attended. *Id.* ¶¶ 59, 60. Item 7.j of the agenda was "City Clerk Employment Discussion." Dkts. 35 ¶ 61; 33-1 at 17. The City Attorney started by explaining that "the City Manager was asked to put this on the agenda by a City Commissioner"— not Mayor-Commissioner Huffman—and that the agenda item does not make any recommendation at all. Dkt. 33-5 at p.2–3 trans. 5:25–6:16. It was simply open for discussion. *Id.* at p.3 trans. 6:7–10. Commissioner Tyler first suggested placing Plaintiff on paid leave until each Commissioner had an opportunity to speak with her about some concerns they had moving forward. Dkt. 35 ¶ 62. Ms. Huffman then commented that she "made a point back in May to express [her] concern with the missing minutes," and that she had new concerns about the recently discovered Municode backlog. Dkt. 33-5 at p.3 trans. 7:8–24. The City Attorney confirmed that

13

Ms. Huffman's concerns regarding Municode were valid "because of the potential ramifications for the City's code not being updated." *Id.* at p.3 trans. 8:23–9:1.

The Commission then voted on Mr. Tyler's motion to place Plaintiff on paid leave. Dkt. 33-1 at 17. Each Commissioner had one vote, and no Commissioner's vote weighed more than another's. Dkt. 35 ¶ 7. Ms. Huffman seconded the motion, which ultimately passed upon a 3-1 vote with Commissioners Huffman, Tyler, and Arroyo voting in the affirmative and Commissioner Hall voting in the negative. Dkt. 33-1 at 17. Only four Commissioners voted; one Commissioner was absent. *Id.*

Investigative attorney Mr. Carmichael opined that, based on his investigation surrounding Plaintiff's grievance against Ms. Huffman, he was not surprised that the Commission suspended her employment. Dkt. 33-9 at p.26 trans. 103:23–104:8.

*Plaintiff's EEOC Charge*

Plaintiff lodged an EEOC charge against the City, signed and dated October 3, 2022. Dkt. 35 ¶ 71. The same day, at 4:39 p.m., Plaintiff's attorney emailed that charge to the City Attorney and Defendant Huffman. *Id.* ¶ 72.

*Plaintiff's Termination*

On October 4, 2022, the Commission terminated Plaintiff's employment during another public meeting. Dkts. 35 ¶ 74; 47 ¶ 76. Commissioner West opened the discussion by noting that Plaintiff had just returned from FMLA leave and he felt it proper for the Commission to attempt rehabilitation before terminating her

employment. Dkt. 33-6 at p.21 trans. 79:12–81:14. Commissioner Arroyo seconded that sentiment. *Id.* at p.21–22 trans. 81:16–82:2. Commissioner Tyler voiced that he felt the period for rehabilitation had passed, and based on Plaintiff's performance, he felt termination was appropriate. *Id.* at p.22 trans. 82:5–83:12. Commissioner Hall admitted she had some questions about Plaintiff's performance but clarified that at the prior public meeting, she voted to keep Plaintiff to oversee her performance rather than suspend her. *Id.* at p.22 trans. 83:14–18. Commissioner Huffman voiced her position that termination was proper based on the backlogged minutes and Municode. *Id.* at p.22–23 trans. 83:19–87:9.

The Commission ultimately voted 3-2 to terminate Plaintiff's employment. Dkt. 35 ¶ 88. Commissioner Tyler specified that termination should be without cause, entitling Plaintiff to severance pay. *Id.* ¶¶ 87, 89. Those voting in favor of Plaintiff's termination were Commissioners Tyler, Hall, and Huffman. *Id.* ¶ 88. Commissioner Tyler's main concern was that the minutes were behind when they never should have been, and the City should not have had to hire outside help to perform Plaintiff's job. Dkts. 35 ¶ 86; 33-14 at p.19 trans. 74:9–75:19. Commissioner Hall voted to terminate Plaintiff's employment because she felt Plaintiff was unhappy and generally that the job "just wasn't for her anymore," also specifically referencing "[Plaintiff's] share of the minutes" that were behind. Dkt. 33-10 at p.12 trans. 45:14–46:9. Commissioner Hall testified that she considered

Plaintiff's grievance, EEOC Charge, and "the whole picture" when terminating Plaintiff. *Id.* at p.13 trans. 49:4–21. The reader is left with the impression that Ms. Hall opted to terminate Plaintiff not because she complained, but because she seemed unhappy, as evidenced by her complaints.

Commissioner Huffman testified at her deposition that she decided she wanted to terminate Plaintiff's employment after she went on FMLA leave. Dkt. 33-11 at p.20 trans. 79:17–21. Defendants contend that this is because it became apparent while Plaintiff was on FMLA leave that she had not satisfactorily kept up to date with the minutes and Municode. Dkt. 35 ¶ 82. Plaintiff reminds the Court that minutes were behind from before Plaintiff became Clerk. Dkt. 33-9 at p.24 trans. 94:1–13.

### *The Instant Motions*

Plaintiff's responses to Defendants' motions for summary judgment have conceded dismissal of her "racial discrimination and racial harassment claims" against Haines City. Dkt. 48 at 1. Plaintiff also states that she has one remaining claim against Defendant Huffman for which she seeks a jury trial: defamation *per se* as it relates to the "other boyfriend" comment made at the June 2 Commission meeting. Dkt. 46 at 1–2. As a result, four claims remain against the City: (1) retaliation under the Florida Civil Rights Act, (2) retaliation under the Florida Public Whistleblower Act, (3) retaliation under the Family Medical Leave Act, and (4)

16

interference under the Family Medical Leave Act. The one defamation *per se* claim remains against Ms. Huffman.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact "might affect the outcome of the suit under the governing law[.]" *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation and internal quotation marks omitted). To satisfy its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must go beyond the pleadings and "identify

affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the nonmoving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the nonmoving party's favor. *Id.* Summary judgment should be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

### *Claims Against Haines City*

The parties do not dispute that Plaintiff engaged in protected activities when she submitted her May 31, 2022 grievance and October 3, 2022 EEOC Charge to the City. Dkt. 34 at 13. The parties also do not dispute that her suspension and termination were adverse employment actions. *Id.*

I.    <u>Retaliation Under the Florida Civil Rights Act</u>

Haines City argues that Plaintiff cannot establish a casual connection between the protected activities and adverse employment actions. Dkt. 34 at 13. She was already on "thin ice" due to backlogged minutes and the Supervisor of Election's letter when she submitted her grievance in May, and the law does not allow her to

insulate herself from discipline by preemptively making a harassment complaint. *Id.* at 14–15. The same argument applies to her submission of an EEOC Charge one day before her termination. *Id.* at 15. Moreover, Plaintiff's suspension and termination occurred approximately four months after her May grievance, and such a temporal distance forecloses causal connection. *Id.*

Plaintiff disputes that she was on "thin ice" considering the Commissioners' knowledge of backlogged minutes before she became Clerk, yet their award of generally positive feedback on her performance reviews in the winter of 2021. Dkt. 48 at 7. Plaintiff further cites the pay raise the Commission openly contemplated for her prior to the filing of the May grievance. *Id.*

Ms. Anderson also responds that a plaintiff shows causal connection when she shows that decisionmakers were aware of protected activity, and that the protected activity and adverse action were not wholly unrelated. *Id.* at 4. She has shown that each Commissioner was aware of her protected activities before her suspension and firing. *Id.* Further, because much of the gap between Plaintiff's May grievance and her September/October suspension/termination contained her FMLA leave, causation is still met. *Id.* at 5–6. This is true especially in light of Commissioner Huffman's request to fire Plaintiff during her leave. *Id.* at 6. Plus, causation exists as to retaliatory acts long removed from protected activity if the events are linked by a chain of intervening acts, and Defendant Huffman engaged in intervening acts

when she made the comment about Plaintiff's "other boyfriend" in June and
Plaintiff's "AWOL" disappearance in July. *Id.* at 6–7.

Claims brought under the Florida Civil Rights Act ("FCRA") are analyzed
under the same framework as claims brought under Title VII. *Alvarez v. Royal Atl.
Devs., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010). "To make out a prima facie case
of retaliation, a plaintiff must show: (1) that she engaged in an activity protected
under Title VII; (2) she suffered a materially adverse action; and (3) there was a
causal connection between the protected activity and the adverse action." *Kidd v.
Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013).

A.    <u>Causal Connection</u>

Establishing a causal connection requires showing "that the desire to retaliate
was the but-for cause of the challenged employment action." *Univ. of Texas Sw.
Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). "[A] plaintiff must show that the
relevant decisionmaker was 'aware of the protected conduct, and that the protected
activity and the adverse actions were not wholly unrelated.'" *Kidd*, 31 F.3d at 1211
(citation omitted).

Generally, temporal proximity, without more, must be very close to suggest
causal connection. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir.
2007). And in the absence of other evidence tending to show causation, a prolonged
delay between the protected activity and adverse employment action defeats the

claim. *Id.* (finding three months between harassment complaint and termination, without any other connecting evidence, defeated Title VII retaliation claim). "Where there was a significant time gap between the protected activity and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate." *See Ward v. United Parcel Serv.*, 580 F. App'x 735, 739 (11th Cir. 2014).

Here, Defendant suggests that causation is lacking because four months technically separated Plaintiff's May grievance and her suspension, but Plaintiff has presented enough evidence to show a *prima facie* case of retaliation. Plaintiff has presented evidence that the Commissioners were aware of her protected conduct, namely the May 31 grievance, when they took adverse action. *See Kidd*, 31 F.3d at 1211. Specifically, Plaintiff has cited evidence that the City Attorney called every Commissioner to inform them of the letter with 24-48 hours of its receipt. Dkts. 43-6 at p. 12 trans. 45:13–48:8; 33-9 at p. 16 trans 62:5–22. Attorney Carmichael testified that Defendant Huffman not only became aware of the grievance almost immediately, but actually received a copy of it that she discussed and released to others. Dkt. 33-9 at p. 16 trans 62:5–22.

When viewed in a light most favorable to her, *Skop*, 485 F.3d at 1136, Plaintiff's subsequent timeline of events supports a connection between her

grievance and suspension/termination. Two days after she lodged her complaint against Ms. Huffman, Ms. Huffman made the "other boyfriend" comment at the June 2 meeting that was "vicious," "uncalled for," and caused the audience to audibly gasp. Dkt. 45 ¶¶ 18, 20, 21. Within just a few weeks of this incident and because of this incident, after struggling to be at work without being distressed, Plaintiff took FMLA leave on June 27. Dkts. 35 ¶ 50; 47 ¶ 47; 43-3 ¶¶ 32, 34. The same day of her return in September, the Commission suspended Plaintiff in only a 3-1 vote pursuant to agenda item "City Clerk Employment Discussion." Dkt. 35 ¶¶ 61, 69. Ms. Huffman seconded the motion and contributed one of the three votes required to suspend Plaintiff. This easily could have been Defendant's "first opportunity" at a scheduled Commission meeting to engage in retaliatory conduct. *See Ward*, 580 F. App'x at 739. Notably, effectively only a few work weeks had lapsed for Plaintiff between her grievance and suspension if FMLA leave is excluded. *See Jimenez-Ruiz v. Sch. Bd. of Sarasota Cnty.,* No. 818CV01768T02AEP, 2020 WL 434927, at *10 (M.D. Fla. Jan. 28, 2020) (considering FMLA leave contributing to five months between protected activity and adverse action). Indeed, Ms. Huffman asked if the Commission could terminate Plaintiff while she was on FMLA leave; the answer was no. Dkt. 44-1 at p.10 trans. 35:22–25.

This all came on the heels of Plaintiff's generally positive performance reviews in the winter of 2021–2022. Dkt. 47 ¶¶ 16, 17, 18 19. True, Commissioners

Huffman and Tyler suggested improvement by more timely submission of records, Dkt. 33-1 at 37, 42, but also concluded their reviews acknowledging that the "potential to excel is clear" and that overall Plaintiff was "a great asset to the city." *Id.* at 46, 41. The Commission also allegedly discussed giving Plaintiff a raise on May 31 before it became aware of the grievance. Dkt. 47 ¶ 42. In sum, Plaintiff has offered enough evidence to suggest that the grievance was not wholly unrelated to her suspension and ultimate termination. *See Kidd*, 31 F.3d at 1211. Summary judgment for Defendant is not appropriate on this issue.

    B.   <u>Thin Ice</u>

Defendant also turns to the Eleventh Circuit rule that "in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). "Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010). In *Alvarez*, the court went on to clarify that if the defendant employer had legitimate, non-discriminatory reasons to fire the plaintiff before she complained, it remained free to do so afterward. 610 F.3d at 1270. It would not be permissible, however, to

fire the plaintiff sooner than it otherwise would have because of the complaint (barring some threat in the complaint that reasonably makes a company fear for its operations or other employees). *Id.*

Defendant's contention that Plaintiff was already on thin ice when she submitted the May grievance is contested. Defendant cites the backlogged minutes and the Supervisor of Elections' letter as the sources of thin ice. Dkt. 34 at 14. But as Plaintiff asserts, some or all Commissioners seemed aware of some possible backlogged minutes from before Plaintiff's tenure, and this was not a point of friction at first. Dkt. 48 at 7. Even more specifically, Defendant Huffman in her performance evaluation requested "[m]ore consistency in providing minutes in a more timely fashion," yet nonetheless gave Plaintiff all 4s and 5s, explaining how Plaintiff "exceeded [her] expectations," had "exceptional" work ethic, and was "reliable," "dependable," and a "great asset to the city." Dkt. 33-1 at 37, 41. Ms. Huffman submitted her performance evaluation in February 2022; she was the last Commissioner to complete it. *Id.* at 41. This alone supports that the backlogged minutes did not have Plaintiff on thin ice; Defendant Huffman gave Plaintiff a glowing review while expressly acknowledging the minutes. Indeed, the entire Commission had discussed giving Plaintiff a raise. Dkt. 47 ¶ 42. This suggests continuing Plaintiff's employment rather than terminating it; it is not suggestive of thin ice. Dkt. 48 at 7.

As for the Supervisor of Elections' letter, the weight of this letter is unclear. Defendant Huffman claims in her deposition testimony that she considered the letter when voting to terminate Plaintiff, but the transcript of the termination meeting does not appear to show that Ms. Huffman mentioned the Supervisor of Elections' letter in her articulated reasons for termination. *Compare* Dkt. 33-11 at p.38–39 trans. 152:24–153:3, *with* Dkt. 33-6 at p.22–23 trans. 83:19–87:9. At least one Commissioner, Commissioner Tyler, expressly stated that he thought the issues in the letter from the Supervisor of Elections could be worked out and that it did not serve as a basis for his ultimate recommendation of termination. Dkt. 33-14 at p.18–19 trans. 72:25–73:9. Thus, the import of the letter is unclear, and creates another dispute that precludes summary judgment for Defendant on this issue.

Finally, the cases Defendant cites are inapposite to the situation here as there is no evidence that the City contemplated firing Plaintiff before she filed her May grievance and took FMLA leave. In *Drago* and *Alvarez*, the facts indicate that the employers had legitimate reasons to contemplate adverse employment action and/or actually did contemplate adverse employment action before the plaintiffs complained. 453 F.3d at 1308; 610 F.3d at 1270. In those instances, the court explained that the employers could proceed with their intended actions despite the plaintiffs' complaints. *Drago*, 453 F.3d at 1308; *Alvarez*, 610 F.3d at 1270. Here, the records does not indicate that the City was aware of legitimate reasons for

suspension/termination or actually contemplated Plaintiff's suspension/termination prior to her May grievance. As discussed above, her performance reviews were largely positive, while acknowledging untimely minutes, and the Commission discussed a pay raise on May 31. If anything, Plaintiff filing an EEOC Charge while suspended and the day before the Commission met to terminate her could be indicative of Plaintiff complaining while on thin ice, but this does not affect her May grievance. At best the evidence is disputed whether she was on thin ice with the City when she made her May grievance; Defendant is not entitled to summary judgment on this issue.

II.    Retaliation Under the Florida Public Whistleblower Act ("FWA")

The City argues that Plaintiff's FWA claim fails because an FWA claim requires that a plaintiff blow the whistle on violations that present a danger to the public's health or safety, or acts of gross mismanagement or malfeasance, and Plaintiff's grievance and EEOC Charge only complained of Ms. Huffman's conduct towards her. Dkt. 34 at 16–17. Plaintiff therefore did not engage in protected activity under the FWA. *Id.* at 17.

Plaintiff responds that her grievance and EEOC Charge complied with the FWA. Dkt. 48 at 9. Her May grievance detailed concerns surrounding a hostile work environment, bullying, defamation, harassment, emotional distress, and "a gross

misuse of the commissioner's seat." *Id.* Similarly, her EEOC Charge, although not required, detailed violations of laws, retaliation, discrimination, and harassment. *Id.*

Florida's Public Whistleblower Act, Florida Statutes section 112.3187 *et seq.*, serves to "prevent agencies and independent contractors from taking retaliatory action against an employee who reports danger to the public's health, safety, or welfare or who alleges improper use of governmental office, gross waste of funds, or other abuse or gross neglect of duty." *Competelli v. City of Belleair Bluffs*, 113 So. 3d 92, 94 (Fla. 2d DCA 2013). The FWA is to be liberally construed. *Irven v. Dep't of Health & Rehab. Servs.*, 790 So. 2d 403, 405 (Fla. 2001). Claims brought pursuant to the FWA are analyzed under the Title VII framework. *Rustowicz v. N. Broward Hosp. Dist.*, 174 So. 3d 414, 419 (Fla. 4th DCA 2015). To state a claim, a plaintiff must allege: "(1) he or she engaged in a statutorily protected activity; (2) he or she suffered an adverse employment action; and (3) there existed a causal connection between the two events." *King v. Bd. of Cnty. Comm'rs*, 226 F. Supp. 3d 1328, 1336 (M.D. Fla. 2016).

A disclosure is "protected" under the FWA if the information includes (1) "[a]ny violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare," or (2) "[a]ny act or suspected act of gross

27

mismanagement, malfeasance, misfeasance, gross waste of public funds, . . . or gross neglect of duty committed by an employee or agent of an agency or independent contractor." Fla. Stat. § 112.3187(5).

Courts have accepted employees' harassment/whistleblowing complaints to employers as protected activity under the FWA, cataloging them as disclosures of "mismanagement, malfeasance, [or] misfeasance . . . by an employee . . . of an agency." *See Lindamood v. Off. of State Att'y, Ninth Jud. Cir. of Fla.*, 731 So. 2d 829, 830–32 (Fla. 5th DCA 1999); *Saunders v. Hunter*, 980 F. Supp. 1236, 1245 (M.D. Fla. 1997); *see also Nazzal v. Fla. Dep't of Corr.*, 267 So. 3d 1094, 1097 (Fla. 1st DCA 2019) (specially acknowledging that the court had not "overlooked" appellant's argument that national origin discrimination complaint was a "statutorily-protected disclosure," but explaining that appellant presented it as a "single conclusory statement" devoid of factual support, so it was insufficient to qualify as a protected disclosure for that reason).

Here, at this stage it is disputed whether Plaintiff's May grievance is a protected disclosure under the FWA. It includes claims for "Hostile Work Environment," "Bullying," "Defamation," and "Psychological Harassment," and lists supporting facts under each claim. Dkt. 33-2 at 29. Indeed, it even concludes that "[a]ny work concerns are correctable, but the personal attacks are unprofessional, with a gross misuse of the commissioners' seat." *Id.* at 30. This is a

whistleblower complaint sufficiently alleging mismanagement or malfeasance that falls within the broad purview of the FWA. Fla. Stat. § 112.3187(5)(b); *Lindamood*, 731 So. 2d at 830–32; *Saunders*, 980 F. Supp. at 1245; *Irven*, 790 So. 2d at 405.

Defendant cites to *Broward County Sheriff's Office v. Hamby*, 300 So. 3d 213, 216–17 (Fla. 4th DCA 2020) to support its argument that Plaintiff's May grievance and EEOC Charge were not protected disclosures under the FWA. However, in *Hamby*, similar to *Nazzal* above, the court found that the hostile work environment allegations were not protected disclosures because they were "conclusory" and "insufficient." 300 So. 3d at 216. The court did not suggest that hostile work environment complaints are not complaints of gross mismanagement and therefore not protected disclosures under the FWA. Defendants are not due summary judgment on this argument.

Further, because FWA claims are also analyzed under the Title VII framework, *Rustowicz*, 174 So. 3d at 419, the Court's above arguments for the FCRA retaliation claim apply here as well. Plaintiff has stated a *prima facie* case of retaliation, and Defendant's arguments for judgment on this point are denied thus far.

III.    Family Medical Leave Act Claims

The FMLA grants employees the right to "a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes

29

the employee unable to perform the functions of the position of such employee." 29

U.S.C. § 2612(a)(1)(D). It also gives employees the right "to be restored by the

employer to the position of employment held by the employee when the leave

commenced; or to be restored to an equivalent position with equivalent employment

benefits, pay, and other terms and conditions of employment." § 2614(a)(1).

There are two types of FMLA claims available to enforce these rights:

retaliation claims and interference claims. *Strickland v. Water Works & Sewer Bd.*

*of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). In a retaliation claim,

an employee asserts that her employer discriminated against her because she

engaged in activity protected by the FMLA. *Id.* (first citing 29 U.S.C. § 2615(a)(1)

& (2); and then citing 29 C.F.R. § 825.220). "[A] plaintiff bringing a retaliation

claim faces the increased burden of showing that his employer's actions 'were

motivated by an impermissible retaliatory or discriminatory animus.'" *Id.* at 1207

(citation omitted). In an interference claim, an employee need only assert that her

employer denied or interfered with her rights under the FMLA. *Id.* at 1206. She need

not allege that the employer intended to deny the right; "the employer's motives are

irrelevant." *Id.* at 1208.

A.    <u>FMLA Retaliation</u>

Haines City again argues Plaintiff cannot establish that her taking FMLA

leave was a but-for cause of her suspension or termination. Dkt. 34 at 20. She was

on "thin ice" due to the backlogged minutes and Supervisor of Election's letter prior to beginning FMLA leave on June 27, 2022. *Id.* And the City learned while Plaintiff was on leave that Municode was out of date. *Id.*

Plaintiff responds that immediately after she requested FMLA leave, Ms. Huffman was angry and retributive, specifically asking if Plaintiff could be fired while on FMLA leave. Dkt. 48 at 11. The City contemplated using tardy FMLA paperwork as a reason for firing Plaintiff, and ultimately suspended Plaintiff the very day she returned from FMLA leave. *Id.*

To state a *prima facie* FMLA retaliation claim, "an employee must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Strickland*, 239 F.3d at 1207. As with the previous claims, to establish a causal connection, "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." *Brungart v. BellSouth Telecomm'ns, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (quotation and citation omitted).

Here, Plaintiff has presented enough evidence to suggest that Plaintiff taking FMLA leave was not wholly unrelated to the subsequent decisions to suspend and terminate her. *See id.* Defendant Huffman asked whether the City could terminate Plaintiff while she was on FMLA leave. Dkt. 44-1 at p.10 trans. 35:22–25. At her deposition, in response to being asked how she expected Plaintiff to update

ordinances with Municode if she was on FMLA leave, Defendant Huffman testified:

"I expected her to have them current at all times." Dkt. 33-11 at p.51 trans. 203:11–

14. In response to being asked whether she expected Plaintiff to work on the minutes

while she was out on FMLA leave, Defendant Huffman testified: "I expected her to

do the minutes after each meeting." *Id.* at p.50 trans. 199:7–10. This evidence

permits the inference, as Plaintiff argues, that Ms. Huffman did not want Plaintiff on

FMLA leave and penalized her for using it when City work remained outstanding.

Dkt. 48 at 11.

Moreover, Mr. Carmichael testified that Defendant Huffman made statements

to the news in July about Plaintiff being "AWOL" despite knowing she was on

FMLA leave. Dkt. 33-9 at p.15 trans. 58:22–59:1. The City's Human Resources

Director testified to a meeting involving Commissioner Huffman, the City Attorney,

and others wherein the participants allegedly asked, "Could we do it?"—meaning

"they were wondering if they could use FMLA to terminate her." Dkt. 44-1 at p.14

trans. 50:6–12. The City's HR Director also attested to the City Attorney and other

managerial employees of the City brainstorming "bogus" reasons to terminate

Plaintiff's employment, such as reasons relating to the timeliness of her FMLA

paperwork. Dkt. 43-5 at 113–14 ¶ 23. Lastly, the Commission suspended Plaintiff

the very day she returned from leave. Dkt. 35 ¶¶ 50, 59, 69. This is sufficient

evidence of "retaliatory . . . animus," see *Strickland*, 239 F.3d at 1207, to create an issue of fact that survives Defendant's motion for summary judgment on this issue.

As for Defendant's argument that Plaintiff was already on thin ice before starting FMLA leave on June 27, the Court has already discussed *supra* pages 23–25 how the backlog of minutes and Supervisor of Elections' letter did not indisputably have Plaintiff on thin ice, as evidenced by her performance reviews and potential pay raise.

Defendant also points out that the City discovered that Municode was behind while Plaintiff was on FMLA leave, and cites *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243–44 (11th Cir. 2010) as a supporting example of when an employer learned of an employee's performance deficiencies while she was on leave, but still used them as legitimate reasons to terminate her. This argument is better addressed in the "Pretext" section of this order below. Here, Plaintiff has stated a *prima facie* FMLA retaliation claim subject to factual dispute requiring trial.

B.    FMLA Interference

Haines City argues that to succeed on an FMLA interference claim, a plaintiff must prove they were denied a benefit they were entitled to under the FMLA, and the City did not deny Plaintiff any of her FMLA rights. Dkt. 34 at 18. The City did not suspend or terminate her employment until after she returned from leave. *Id.* Defendants contend that Plaintiff may argue the City violated the law by calling her

doctor to inquire about her FMLA status, but this technical violation does not show that Plaintiff was harmed as it does not show that Plaintiff's FMLA leave was delayed, shortened, denied or affected in any way. *Id.* at 18–19.

Plaintiff responds that the City violated the FMLA by not adjusting its performance expectations to take into account Plaintiff's protected FMLA qualifying absences. Dkt. 48 at 19. Plaintiff also asserts Defendant Huffman's deposition testimony reflects that she penalized Plaintiff for not keeping the minutes and Municode updated while she was on FMLA leave. *Id.* Further, the City denied Plaintiff a benefit to which she was entitled if the City considered her FMLA leave when suspending or terminating her employment. *Id.* at 20. Finally, because the City did not restore Plaintiff to her position, she has suffered damage under the FMLA. *Id.*

To succeed on an FMLA interference claim, "a plaintiff must prove that she was denied a benefit to which she was entitled under the FMLA, and that, as a result, she was prejudiced in some way that is remediable by either damages or equitable relief." *Lapham v. Walgreen Co.*, 88 F.4th 879, 895–96 (11th Cir. 2023) (cleaned up). Under the FMLA, "an employee returning from covered leave is entitled to be restored to his former position or its equivalent" unless the employer can show that it "would have discharged the employee had he not been on FMLA leave." *Strickland*, 239 F.3d at 1208.

34

Here, the record does not establish beyond dispute that the City would have suspended and then terminated Plaintiff had she not taken FMLA leave. As discussed above at pages 31–32, Commissioner Huffman apparently expected that the minutes and Municode backlog somehow be substantially rectified during the couple months Plaintiff was on FMLA leave. *See, e.g.*, Dkt. 33-11 at p.51 trans. 203:11–14 ("I expected her to have [Municode] current at all times."). It seems to be the City's position that it would have retained Plaintiff had the minutes and Municode been up to date, but she was on FMLA leave during much of the time this could have been accomplished. Indeed, it is Defendant's position that the Municode issue came to light while Plaintiff was on FMLA leave, Dkt. 34 at 3 ¶ 11, offering her no opportunity to update it as she intended to do in July 2022. Dkt. 35 ¶ 54; *see Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008) (finding genuine issue of material fact remained for FMLA interference claim when the plaintiff might have been retained if he had completed specified work, but the reason he was not able to complete the work was because of his being on FMLA leave). Moreover, maliciously or not, Commissioner Hall testified that she considered "the whole picture" when voting to terminate Plaintiff. Dkt. 33-10 at p.13 trans. 49:4–21. And the Commission suspended Plaintiff the day she returned from leave. This can all be interpreted as evidence that Plaintiff was penalized for taking FMLA leave.

As such, she has stated an FMLA interference claim that survives Defendant's motion for summary judgment.

## IV.  The Retaliation Claims— Legitimate Reasons and Pretext

The FCRA, FWA, and FMLA retaliation claims above are analyzed like a Title VII claim. *Alvarez*, 610 F.3d at 1271; *Rustowicz*, 174 So. 3d at 419; *Strickland*, 239 F.3d at 1207. Where a Title VII claim for retaliation is supported by circumstantial evidence rather than direct evidence, courts apply the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff must establish a *prima facie* case of retaliation. *See McDonnell Douglas*, 411 U.S. at 802. Then, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for the challenged employment action. *See id.* If the defendant does so, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful [retaliation], an obligation that 'merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional [retaliation].'" *See Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1221 (11th Cir. 2019) (citation omitted).

### A.  Legitimate Reasons for Suspension and Termination

As discussed above, Plaintiff has established *prima facie* claims of retaliation. At this juncture, the burden is on the City to articulate legitimate, nonretaliatory reasons for suspending and terminating Plaintiff. As Defendant argued throughout

its motion, it terminated Plaintiff's employment "because of the backlog of minutes, Municode not being kept updated, and the Supervisor of Elections letter." Dkt. 34 at 22.

Defendant submits that maintaining the minutes was one of Plaintiff's core duties, and that "[p]rompt recording of the minutes is vital to the City due to Section 286.011(2), Florida Statutes, which requires the minutes of public meetings to be 'promptly' recorded and open to public inspection." Dkt. 34 at 22–23. Plaintiff admitted that some minutes were not up to date, to the point where Plaintiff hired someone to help her in February 2022 and the Commission hired an outside agency for more reinforcement in May 2022. *Id.* at 23. The Commission, and specifically Commissioner Huffman, had voiced some concerns about the timeliness of the minutes *Id.*

As for Municode, it was also a core duty of Plaintiff's and also concerning to the City because of the potential legal ramifications of the City's code being outdated. *Id.* Plaintiff was aware that Municode was behind and, per Defendant's version of events, made no plans for her office to update Municode while she was away. *Id.* at 23–24.

Finally, Defendant summarily contends that Plaintiff cannot dispute "the City Commissioners' reliance upon the Polk County Supervisor of Elections letter." *Id.* at 24. On the whole, the Court is satisfied that these are legitimate, nonretaliatory

reasons to terminate Plaintiff's employment as the Haines City Clerk. As Defendant states, "[t]hese reasons related directly to significant performance issues by Plaintiff which jeopardized the City's compliance with Florida law." *Id.*

B.    Pretext

A plaintiff may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981). A plaintiff must "produce sufficient evidence to allow a reasonable finder of fact to conclude that the [defendant's] articulated reasons were not believable." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). "She could do this by pointing to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered explanation." *Id.* (citation omitted). "The plaintiff must meet the reason proffered head on and rebut it." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). If a defendant offers more than one legitimate reason, the plaintiff must rebut them all to survive a motion for summary judgment. *Id.*

Here, Plaintiff has produced sufficient evidence to create factual issues surrounding Defendant's reasons for suspension and termination. Beginning with the minutes, Plaintiff has presented evidence that City Commissioners and staff

members knew of backlogged minutes from long before Plaintiff filed her May grievance and took FMLA leave. Dkts. 33-10 at p.8 trans. 29:3–30:22; 33-11 at p.33 trans. 132:6–8; 43-5 at 114 ¶¶ 26, 27, 28. Attorney Carmichael testified that the issue of missing minutes had been the subject of many Commission meetings. Dkt. 33-9 at p.24 trans. 94:1–95:1. Defendant Huffman's performance review of February 2022 both requested more timely minutes and lauded Plaintiff as an exceptional worker and asset to the City. Dkt. 33-1 at 37, 41. Indeed, the City's approach to the backlogged minutes before Plaintiff left for FMLA leave was to hire help for Plaintiff to get the minutes up to date, not to discipline her for the backlogged minutes. Dkt. 48 at 15–16. The influence of the minutes on the Commission's ultimate adverse actions towards Plaintiff is thus debatable. These are weaknesses and inconsistencies in the City's proffered explanation that could indicate pretext. *See Crawford*, 482 F.3d at 1308.

Largely the same argument applies to Municode. Plaintiff has presented evidence that the Commission knew Municode was behind before Plaintiff submitted her May grievance, Dkt. 33-9 at p.29 trans. 113:6–11, yet Defendant only treated it as a problem in the midst of Plaintiff's FMLA leave. That is how Plaintiff's case differs from *Schaaf*. There, the court explained that "the evidence shows that Schaaf was demoted because of managerial ineffectiveness that revealed itself in full only in her absence; she was not demoted because (i.e. *for the reason that*) she took

FMLA leave. It does not appear that Schaaf presented the district court with any evidence to the contrary[.]" *Schaaf*, 602 F.3d at 1243 (emphasis in original). Here, Plaintiff has presented the Court with evidence to the contrary. Specifically, Plaintiff has presented evidence the Commissioners knew about backlogged Municode before she went on leave, and, as discussed in more detail below, evidence of statements and actions by City Commissioners and staff that suggest hostility towards Plaintiff's protected activity.

Finally, the Court has already discussed the implausibility of the Supervisor of Elections' letter serving as a basis to terminate Plaintiff. *Supra* p. 25. It does not appear that any of the Commissioners mentioned the Supervisor of Elections' letter as part of their rationale for terminating Plaintiff at the October 4 Commission meeting. *See generally* Dkt. 33-6. Of the three Commissioners who voted to terminate Plaintiff, one expressly stated that he thought the issues in the letter from the Supervisor of Elections could be worked out and that it did not serve as a basis for his ultimate recommendation of termination. Dkt. 33-14 at p.18–19 trans. 72:25–73:9.

On that note, of the three Commissioners who voted to terminate Plaintiff—Huffman, Hall, and Tyler—at least two arguably did so based on Plaintiff's protected conduct. Dkt. 35 ¶ 88; *see Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1241–42 (11th Cir. 2016) (denying summary judgment when three of the five majority

voters on school board made statements evidencing discrimination). The evidence supporting Defendant Huffman's alleged retaliatory animus has been discussed at length throughout this Order and need not be rehashed here. And as for Commissioner Hall, she testified that, maliciously or not, she considered Plaintiff's grievance, EEOC Charge, and "the whole picture" of Plaintiff's tumultuous employment when voting to terminate her. Dkt. 33-10 at p.13 trans. 49:4–21.

Plaintiff raises many other arguments to show pretext. For one, "language not amounting to direct evidence, but showing some [retaliatory] animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (quotation and citation omitted). The City's Human Resources Director testified to a meeting involving Commissioner Huffman, the City Attorney, and others wherein the participants allegedly asked, "Could we do it?"—meaning "they were wondering if they could use FMLA to terminate her." Dkt. 44-1 at p.14 trans. 50:6–12.

Next, "[d]epartures from normal procedures may be suggestive of discrimination." *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985). The City's HR Director also testified to Plaintiff being treated differently and more strictly than other employees using FMLA regarding the submission of her FMLA paperwork. Dkt. 44-1 at p.20 trans 76:7–77:12.

Finally, pretext can also be demonstrated by shifting explanations for an employer's actions. *See Bechtel Const. Co. v. Sec'y of Lab.*, 50 F.3d 926, 935 (11th Cir. 1995). The City's HR Director testified to what she felt were "bogus" reasons from City staff to terminate Plaintiff. Dkt. 44-1 at p.14 trans. 53:20–25. "[T]here was never a time when you weren't—they weren't talking about terminating her. It was about the minutes. It was about the FMLA. Any area that, you know, normally you would not use, that was what was being done." *Id.* She testified that some of the "bogus" reasons included mistakenly tardy FMLA paperwork and whether Plaintiff could be categorized as a "key employee" able to be terminated based on a given salary calculation. *Id.* at p.14 trans. 51:7–53:25.

Suffice it to say, Plaintiff has "produce[d] sufficient evidence to allow a reasonable finder of fact to conclude that the [defendant's] articulated reasons were not believable." *See Brooks*, 446 F.3d at 1163. As such, Haines City, Florida's motion for summary judgment, Dkt. 34, is denied.

### *Claim Against Anne Huffman*

There is one defamation *per se* claim against Ms. Huffman based on the following comment made at the June 2 Commission meeting: "And just for those of you who are not aware, that's our City Clerk, Erica Anderson's other boyfriend." Dkt. 35 ¶ 49. Defendant argues that the statement was a mixed-opinion statement

because it only said that Plaintiff had more than one boyfriend, but required the listener to draw the inference that Plaintiff was promiscuous. Dkt. 36 at 8. Further, Plaintiff cannot show the statement injured her because she still married Mr. Gaston less than one year after Defendant made the comment. *Id.* at 9. Finally, Defendant contends she did not make the statement negligently or with knowledge or reckless disregard; she contends she actually believed Plaintiff had two boyfriends. *Id.*

Defendant also argues that she enjoys absolute immunity from defamation claims for statements made within the course and scope of her duties as a public official. *Id.* at 13. She argues that "[c]ourts are quick to grant absolute immunity when the official making the statements had supervisory authority over the employee," and that she was one of Plaintiff's five bosses as a Commission member. *Id.* at 15–16. Further, because Defendant made the comment while conducting her duties at a Commission meeting, she is entitled to absolute immunity. *Id.* at 16–17.

Ms. Anderson responds that Ms. Huffman was not acting within the scope of her duties when she made the comment. Dkt. 46 at 5. At that time, neither her nor the Commission were discussing Plaintiff, her job duties or performance, her leave needs, etc. *Id.* at 6. Defendant Huffman made the comment alone and beyond the scope of her duties, and she is not entitled to immunity for doing so. *Id.* Moreover, there existed no good-faith basis for the statement and many agreed it was vicious and inappropriate. *Id.* at 7–8. Plaintiff argues she has suffered injury in the form of

humiliation, emotional distress, therapy and medical treatment, reputational harm,

and economic damage due to inability to obtain subsequent employment. *Id.* at 9.

And regardless, Plaintiff contends defamation is actionable *per se* if it imputes to a

woman acts of unchastity. *Id.* at 9–10.

A.   <u>Immunity</u>

Before reaching the defamation claim, the Court must address whether

Defendant Huffman is entitled to immunity. Florida law grants public officials

absolute immunity from claims of defamation for statements made within the course

and scope of their duties. *Hauser v. Urchisin*, 231 So. 2d 6, 7–8 (Fla. 1970); *see also*

*McNayr v. Kelly*, 184 So. 2d 428, 429–30 (Fla. 1966). The Florida Supreme Court

stated in *McNayr* and reiterated in *Hauser*:

> It seems to be well settled in this State that words spoken or written by
> public servants in judicial and legislative activities are protected by
> absolute privilege from liability for defamation. However false or
> malicious or badly motivated the accusation may be, no action will lie
> therefor in this State. Nor is it questioned that such absolute immunity
> in this State extends to county and municipal officials in legislative or
> quasi-legislative activities as well as to members of the State
> Legislature and activities connected with State legislation.

184 So. 2d at 430; 231 So. 2d at 8. Immunity turns on whether an official acted

within the scope of her duties, which includes "the type of conduct which the

employee is hired to perform, [] conduct [that] occurs substantially within the time

and space limits authorized or requested by the work to be performed, and [] conduct

44

[that] is activated at least in part by a purpose to serve the employer." *Cameron v. Jastremski*, 246 So. 3d 385, 387–88 (Fla. 4th DCA 2018) (citation omitted).

This immunity is applied largely, if not entirely, in contexts where employers, pursuant to their duties, are engaging in dialogue or employment decisions regarding their employees and their job performance. *See Hauser*, 231 So. 2d at 7 (immunity applied where city commissioner explained removal of the city prosecutor); *de Castro v. Stoddard*, 314 So. 3d 397, 403 (Fla. 3d DCA 2020) (immunity applied where mayor made blog posts regarding conduct and performance of city's chief of police); *see also Del Pino-Allen v. Santelises*, 240 So. 3d 89, 91 (Fla. 3d DCA 2018) (immunity "not discernible from the four corners of the complaint" because complaint did not establish "that [defendant] was required by administrative rule to evaluate the job performance of Ms. Pino–Allen"); *cf. Albritton v. Gandy*, 531 So. 2d 381, 387 (Fla. 1st DCA 1988) (immunity did not apply where county commissioner engaged in campaign to have another county employee fired because it was not within commissioner's duties to hire and fire); *Cameron*, 246 So. 3d at 389–90 (immunity not discernible from complaint and court would be "hard-pressed" to see "how the orbit of an instructor's responsibilities is so broad that it encompasses passing along gossipy repetition").

While a close call, Ms. Huffman's "other boyfriend" comment at the June 2 Commission meeting was not made pursuant to her job duties regarding the City

Clerk, and is therefore not entitled to immunity. One, and perhaps the only, factually on-point case explained the distinction between the venue of the statement and the content of the statement well:

> [Defendant's] argument focuses on the venue and audience rather than substance of his statements. Specifically, he claims he is entitled to immunity because his statements were made at [a] Commission meeting . . . , and on the Telegram app, which is used by the City's police officers . . . . But, as demonstrated in *Albritton*, the venue and audience are not dispositive of this issue. In *Albritton*, it did not matter that the commissioner was speaking to a county administrator, only that the commissioner was speaking about personnel issues when he "was not in charge of hiring or firing." 531 So. 2d at 387. Thus, the fact that [Defendant's] statements were made to other police officers at a police meeting and in police forums informs but does not dictate the Court's conclusion. The fact that [Defendant] was speaking about another officer's personal and employment matters, which arguably had no relevance to [Defendant's] employment at the Department, takes this situation outside the ambit of immunity. Accordingly, [Defendant] is not entitled to absolute immunity for his statements that Plaintiff "ran away from a fight" and that he had "domestic violence issues."

*Gomez v. City of Miami*, 696 F. Supp. 3d 1176, 1202–03 (S.D. Fla. 2023), *appeal dismissed*, No. 23-13763, 2024 WL 542017 (11th Cir. Feb. 12, 2024), and *aff'd*, No. 23-13364, 2024 WL 4369605 (11th Cir. Oct. 2, 2024).

Likewise here, there was no official purpose for Commissioner Huffman's statements; they were made outside the scope of her duties. The Commission was not discussing Plaintiff or her employment in any way, and Ms. Huffman's comment would not have contributed anything relevant to that conversation had it been occurring. Dkt. 46 at 8. That the comment was made at a Commission public meeting

is not dispositive because Defendant spoke about Plaintiff's personal matters, which was entirely unnecessary and had no relevance to Plaintiff's job, the City, Defendant, Defendant's duties, Defendant's thoughts on Plaintiff's job performance, etc. *Gomez*, 696 F. Supp. 3d at 1202–03. Ms. Huffman is not immunized from this defamation claim.

B.    Defamation *per se*

"Defamation under Florida law has these five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).

Defendant's first argument is that the "other boyfriend" comment was mixed opinion. Dkt. 36 at 8. "For a statement to be mixed opinion, the communicator's statement must imply that 'a concealed or undisclosed set of defamatory facts would confirm' the statement." *Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 459 (Fla. 3d DCA 2023). Although Defendant does not explain the legal significance of this distinction, the Court fails to see how the "other boyfriend" comment would be mixed opinion. There are no concealed or undisclosed facts that would confirm the statement. All of the "facts" are in the statement—namely that Defendant supposedly

believed Mr. Gaston to be Plaintiff's "other boyfriend." Dkt. 36 at 8. Defendant argues that the comment does not expressly state that Plaintiff was promiscuous and that must be inferred, but *that* would be the opinion one might hold of someone having multiple boyfriends. That Plaintiff had two boyfriends is a "factual" statement. This argument is rejected.

Defendant's second argument is that Plaintiff cannot show the statement was defamatory because she still married Mr. Gaston after the comment was made, and she cannot identify any other injury she suffered. Dkt. 36 at 9. A statement is defamatory if it "tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." *Rapp*, 997 So. 2d at 1109. Moreover, "an oral communication is actionable per se [], without a showing of special damage—if it imputes to . . . a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club*, 66 So. 2d 495, 497 (Fla. 1953); *see also Ford v. Rowland*, 562 So. 2d 731, 735 (Fla. 5th DCA 1990) ("Statements which impute unchastity on the part of a woman plaintiff are libelous per se."). When statements are actionable *per se*, "their injurious character is a fact of common notoriety . . . . They necessarily import damage, and therefore in such cases general damages need not be pleaded or proved, but are conclusively presumed to result; nor

need special damage be shown in order to sustain the action." *Campbell*, 66 So. 2d at 497.

Beyond the fact that Plaintiff's claim is for defamation *per se*, in which damage is presumed, she has offered evidence of injury suffered as a result of the statement. She proffers reputational harm and emotional distress, plus resultant medical leave, treatment, therapy and economic harm. Dkt. 46 at 9; *see Klayman v. Jud. Watch, Inc.*, 22 F. Supp. 3d 1240, 1253 (S.D. Fla. 2014), *aff'd* (Feb. 17, 2015) (finding evidence of actual damages in defamation case based on reputational harm, lost donations, emotional distress, and difficulty sleeping and concentrating at work). Defendant's second argument is rejected.

Finally, Defendant contends Plaintiff cannot show that Ms. Huffman made the statement with knowledge or reckless disregard as to falsity. Dkt. 36 at 9. Plaintiff has presented sufficient evidence to survive this argument as well. Plaintiff avers that she did not have multiple boyfriends and never spoke to Ms. Huffman about her personal life or relationships. Dkts. 33-7 at p.60 trans. 235:9–11; 43-3 ¶¶ 28–30. Commissioner West[1] testified that Commissioner Huffman made the comment based on "hearsay" and he felt it inappropriate for her to comment on something she "can't prove is true." Dkt. 33-15 at p.4–5 trans. 16:17–17:11. This factual issue, and

---

[1] This individual's brother, a former Commissioner, was the subject of the "other boyfriend" statement. Dkt. 33-11 at p.28 trans. 109:9–15.

all the factual issues herein, are not appropriately resolved on a motion for summary judgment. *See Anderson*, 477 U.S. at 248–52.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) Defendant City of Haines City, Florida's motion for summary judgment, Dkt. 34, is **DENIED**.

(2) Defendant Anne Huffman's motion for summary judgment, Dkt. 36, is **DENIED**.

(3) The case will proceed to trial on the May 2025 docket.

**DONE AND ORDERED** in Tampa, Florida, on March 28, 2025.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record